UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————————

MAJOR DATA UAB,

Petitioner

v.

BRIGHT DATA LTD.,

Patent Owner

———————————————————

Case IPR2022-00916

Patent No. 10,484,510

———————————————————

**PATENT OWNER'S NOTICE OF APPEAL**

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Pursuant to 35 U.S.C. §§ 141, 142, and 319, and 37 C.F.R. §§ 90.2 and 90.3, notice is hereby given that Patent Owner Bright Data Ltd. appeals to the U.S. Court of Appeals for the Federal Circuit from the Final Written Decision (Paper 50) entered on September 13, 2023 in IPR2022-00916, and from all underlying orders, decisions, ruling, and opinions that are adverse to Patent Owner.[1,2] The public version of the Final Written Decision (Paper 51) entered on September 15, 2023 is

---

[1] Lead Case No. 23-2144, pending in its early stages before the Fed. Cir., involves the same patent, the same disputed claim terms, and the same primary prior art reference (Crowds).

[2] Patent Owner is simultaneously filing a Notice of Appeal in IPR2022-00915 and IPR2022-00916, which involve related patents having the same specification, the same disputed claim terms, and the same prior art references. There are also similar claim construction issues in pending administrative matters: IPR2021-01492, IPR2021-01493, and IPR2022-00687; as well as Reexamination Control Nos. 90/014,652, 90/014,816, 90/014,624, and 90/014,827; all which involve related patents having the same specification. There are also similar claim construction issues in stayed Reexamination Control Nos. 90/014,875 and 90/014,876, as well as stayed district court matters: Case Nos. 2:19-cv-395, 2:19-cv-396, and 2:19-cv-414 in the Eastern District Court of Texas.

attached to this Notice as Exhibit A.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner intends to appeal at least the following issues:

    i.    Whether the Board's construction of the claim term "client device" was incorrect and/or not reasonable in light of the evidence of record;

    ii.    Whether the Board's construction of the claim term "second server" was incorrect and/or not reasonable in light of the evidence of record;

    iii.    Whether the Board erred in determining that Petitioner established by a preponderance of the evidence that claims 1, 6-7, 15-16, and 18-24 of U.S. Patent No. 10,484,510 ("the '510 Patent") are unpatentable as anticipated by Crowds[3];

    iv.    Whether the Board erred in determining that Petitioner established by a preponderance of the evidence that claims 2, 8-11, and 13 of the '510 Patent are unpatentable as obvious over the combination of Crowds and

---

[3] Michael Reiter & Aviel Rubin, Crowds: Anonymity for Web Transactions, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds").

RFC 2616[4];

v.    Whether the Board erred in determining that Petitioner established by a preponderance of the evidence that claim 17 of the '510 Patent is unpatentable as anticipated by Border[5]; and

vi.   Whether the Board erred in any further findings or determinations supporting or relating to the issues above, including the Board's consideration of the expert testimony, prior art, secondary considerations of non-obviousness, and other evidence in the record.

Pursuant to 37 C.F.R. § 90.3, this Notice is timely, having been duly filed within 63 days after the date of the Final Written Decision.

A complete and entire copy of this Notice is being filed simultaneously with each of the Patent Trial and Appeal Board and the Clerk's Office for the U.S. Court of Appeals for the Federal Circuit, along with the required fee. A complete and entire copy of this Notice is being served simultaneously on each of the Director of the

---

[4] Fielding, et al., RFC 2616, Hypertext Transfer Protocol -- HTTP/1.1, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

[5] Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border").

U.S. Patent and Trademark Office and the petitioner.

No fees are believed to be due to the U.S. Patent and Trademark Office in connection with this filing, but authorization is hereby given for any requisite fees to be charged to Deposit Account No. 603803 (Customer No. 144371).

Respectfully submitted,

Date: September 18, 2023

By: /s/ *Thomas M. Dunham*
Thomas M. Dunham
Reg. No. 39,965

Cherian LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEY FOR PATENT OWNER,
BRIGHT DATA LTD.

# CERTIFICATE OF FILING AND SERVICE

The undersigned hereby certifies a complete and entire copy of this paper was served on the undersigned date by hand on the Director of the USPTO at the following address:

> Office of the General Counsel
> United States Patent and Trademark Office
> Madison Building East, Room 10B20
> 600 Dulany Street
> Alexandria, VA 22314

The undersigned hereby certifies a complete and entire copy of this paper was filed on the undersigned date with the Clerk's Office for the United States Court of Appeals for the Federal Circuit and that the required docket fee was paid electronically through the Court's CM/ECF system.

The undersigned hereby certifies a complete and entire copy of this paper was served on the undersigned date via email, as authorized by Petitioner, at the following email addresses:

> rhuang@mkwllp.com
>
> vma@mkwllp.com
>
> jbartlett@mkwllp.com

Respectfully submitted,

Date:  September 18, 2023

By: /s/ *Thomas M. Dunham*
Thomas M. Dunham
Reg. No. 39,965

Cherian LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEY FOR PATENT OWNER,
BRIGHT DATA LTD.

# EXHIBIT A

PUBLIC VERSION

Trials@uspto.gov                                     Paper 51
Tel: 571-272-7822                      Entered: September 15, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

MAJOR DATA UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

_____

IPR2022-00916
Patent 10,484,510 B2

_____

Before THOMAS L. GIANNETTI, KEVIN C. TROCK, and
SHEILA F. McSHANE, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motion to Seal and Protective Order
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

IPR2022-00916
Patent 10,484,510 B2

## I.  INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons discussed herein, we determine that Petitioner, Major Data UAB, has shown by a preponderance of the evidence that claims 1, 2, 6–11, 13, and 15–24 of U.S. Patent No. 10,484,510 B2 (Ex. 1001, "the '510 patent") are unpatentable.  *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

## II.  BACKGROUND

*A.  Procedural History*

Major Data UAB ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1, 2, 6–11, 13, and 15–24 of the '510 patent (the "challenged claims").  Bright Data Ltd.[1] ("Patent Owner") filed a Preliminary Response.  Paper 12.  With authorization from the panel, Petitioner filed a Preliminary Reply (Paper 16), and Patent Owner filed a Preliminary Sur-reply (Paper 17).  Based upon the record at that time, we instituted *inter partes* review on all challenged claims on grounds presented in the Petition.  Paper 18 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response (Paper 31, "PO Resp."), Petitioner filed a Reply (Paper 37, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 38, "PO Sur-reply").

---

[1] According to Petitioner, Bright Data Ltd. was formerly known as Luminati Networks, Ltd.  *See* Pet. 1.

IPR2022-00916
Patent 10,484,510 B2

On June 9, 2023, an oral hearing was held. A transcript of the hearing is made part of the record. *See* Paper 48.

B. *Related Matters*

The parties identify several district court proceedings involving the '510 patent and a related patent, U.S. Patent No. 10,257,319 ("the '319 patent"), including *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) (the "NetNut Litigation"); and *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation"). Pet. 2–3; Paper 6, 2–3. The parties also identify a number of district court actions involving patents related to the '510 patent. *Id.*

According to the parties, the '510 patent has been before the Board in IPR2020-01358, IPR2021-01493, IPR2022-00138, and IPR2022-00862. Pet. 4; Paper 6, 1–2.

In addition, Patent Owner identifies an *ex parte* reexamination proceeding involving the '510 patent, Control No. 90/014,876, which has been stayed. Paper 6, 2; IPR2021-01493, Paper 13.

C. *Real Parties-in-Interest*

Petitioner identifies Major Data UAB as the real party-in-interest. Pet. 2. Patent Owner "certifies that Bright Data Ltd. is the real party-in-interest." Paper 6, 1.

D. *The '510 Patent*

The '510 patent is titled "System Providing Faster and More Efficient Data Communication." Ex. 1001, code (54). According to the '510 patent, there is a "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require

IPR2022-00916
Patent 10,484,510 B2

infrastructure investment for ISPs." *Id.* at 1:57–59. The patent states that other "attempts at making the Internet faster for the consumer and cheaper for the broadcaster," such as proxy servers and peer-to-peer file sharing, have various shortcomings. *Id.* at 1:61–62.

The '510 patent describes a system and method "for faster and more efficient data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below (*id.* at 4:43–45):



**FIG. 3**

Figure 3 is a schematic diagram depicting communication network 100 including a number of communication devices. *Id.* at 4:5–7. Due to the

IPR2022-00916
Patent 10,484,510 B2

functionality provided by software stored within each communication device, "each device may serve as a client, peer, or agent, depending upon requirements of the network 100." *Id.* at 4:50–52.

Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:58–60. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." *Id.* at 4:67–5:2. Acceleration server 162 includes an acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein." *Id.* at 5:10–18.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser. *See id.* at 12:65–13:3. If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162. *Id.* at 13:8–15. Acceleration server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36.

Each agent responds to the client with information which "can help the client to download the requested information from peers in the network." *Id.* at 13:53–57. "Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such

IPR2022-00916
Patent 10,484,510 B2

a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have." *Id.* at 13:57–61.

The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

E. *Illustrative Claim*

Claim 1 is the only independent challenged claim of the '510 patent, and is illustrative of the claimed subject matter.[2]

> 1. [Preamble] A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:
>
> [a] establishing a Transmission Control Protocol (TCP) connection with a second server;
>
> [b] sending, to the web server over an Internet, the first content identifier;
>
> [c] receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and
>
> [d] sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.

---

[2] Paragraph references in brackets proposed by Petitioner. *See* Pet. 25–31.

IPR2022-00916
Patent 10,484,510 B2

Ex. 1001, 19:18–31.

*F.    Prior Art References and Other Evidence*

Petitioner relies on the following references:

1.    Michael Reiter & Aviel Rubin, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds");

2.    Marc Rennhard, *MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access* (2004) (Ex. 1008, "MorphMix");

3.    Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border"); and

4.    Fielding, et al., RFC 2616, *Hypertext Transfer Protocol -- HTTP/1.1*, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

In addition to these references, Petitioner relies on a Declaration of Keith J. Teruya.  Ex. 1005 ("Teruya Decl.").  Patent Owner relies on the Declaration of Tim A. Williams, Ph.D.  Ex. 2065 ("Williams Decl.").

IPR2022-00916
Patent 10,484,510 B2

### G. *Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability. Pet. 11.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)[3] |
|---|---|---|
| 1, 6, 7, 15, 16, and 18–24[4] | 102[5] | Crowds |
| 1, 2, 6–11, 13, 15, 16, and 18–24 | 103 | Crowds, RFC 2616 |
| 1, 6, 10, 15–20, 23, and 24 | 102 | Border |
| 1, 6, 8–11, 13, 15–20, and 22–24 | 103 | Border, RFC 2616 |
| 1, 6–8, 13, 15, 16, and 18–24 | 102 | MorphMix |
| 1, 2, 6–11, 13, 15, 16, and 18–24 | 103 | MorphMix, RFC 2616 |

---

[3] Petitioner's obviousness challenges additionally refer to the "[k]nowledge of [a person of ordinary skill in the art]." Pet. 11. We understand this to refer to a person of ordinary skill in the art's understanding of the applied references and not to supplying missing limitations or incorporating an unspecified disclosure by reference to supply missing claim limitations. General knowledge in the art, unsupported by the references, cannot supply a missing limitation. *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide 36 (Nov. 2019), *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.

[4] We note that Petitioner's listing of the asserted grounds excludes claim 13 for this ground. S*ee* Pet. 11. However, Petitioner includes claim 13 in its analysis of anticipation based on Crowds (*see id.* at 33).

[5] Because the application from which the '510 patent issued has an earliest effective filing date before March 16, 2013 (Ex. 1001, (60)), citations to 35 U.S.C. §§ 102 and 103 are to the pre-AIA versions. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29.

IPR2022-00916
Patent 10,484,510 B2

### III.  ANALYSIS OF THE CHALLENGED CLAIMS

*A.  Applicable Legal Standards*

The Federal Circuit addressed the legal standard for anticipation in *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331 (Fed. Cir. 2016), stating that "[u]nder 35 U.S.C. § 102(b), a prior art reference will anticipate if it "disclose[s] each and every element of the claimed invention . . . arranged or combined in the same way as in the claim." 815 F.3d at 1341 (alteration in original).  The Federal Circuit went on to explain:

> However, a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would at 'once envisage' the claimed arrangement or combination.

*Id.* (quoting *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015)) (alteration in original).

A claim is unpatentable as obvious under 35 U.S.C. § 103 "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103 (2011).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) so-called "secondary considerations," including commercial success, long-felt but unsolved needs, failure of others, and unexpected results.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

IPR2022-00916
Patent 10,484,510 B2

*B.    Level of Ordinary Skill in the Art*

According to Petitioner, a person of ordinary skill in the pertinent art "would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems as of the Priority Date." Pet. 16.  Petitioner continues that "[s]uch a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols." *Id.* (citing Ex. 1005 ¶¶ 25–27, 51–54).

Patent Owner submits that a person of ordinary skill in the art would have had "a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet communications." PO Resp. 2 (citing Ex. 2065 ¶ 25).  Patent Owner notes that its analysis does not change under the Board's preliminary assessment of a person of ordinary skill in the art in the Institution Decision, wherein Petitioner's proposed level of qualifications was adopted.  PO Resp. 2; Dec. 13–14.

We regard Petitioner's more specific definition as consistent with the '510 patent and the prior art before us.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill).  Therefore, we adopt Petitioner's description.

*C.    Claim Construction*

Pursuant to 37 C.F.R. § 42.100(b) (2023), we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303

10

IPR2022-00916
Patent 10,484,510 B2

(Fed. Cir. 2005) (en banc). Under *Phillips*, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Id.* at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317.

Only those terms that are in controversy need be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Petitioner contends that the district court's constructions in *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation")[6], are appropriate for use in this case. Pet. 16–19. In particular, Petitioner points to two claim construction orders in that case—the "*Teso* Order" (Ex. 1017) and the "*Teso* Supplemental Order" (Ex. 1020). According to Petitioner, the parties in the Teso Litigation agreed to certain constructions that were subsequently adopted by the district court. Pet. 16–

---

[6] The case caption in the Teso Litigation was later changed to identify the plaintiff as Bright Data Ltd. *See* Ex. 1020, 1.

IPR2022-00916
Patent 10,484,510 B2

17. There, the district court construed the preamble of claim 1 of the '510 patent to be limiting and construed certain other terms to have their "plain and ordinary meaning." *Id.*

Petitioner also points out that the district court in the Teso Litigation construed certain disputed claim terms, including "client device" and "second server." *Id.* at 17. There, the district court construed "client device" as a "communication device that is operating in the role of a client." *Id.*; Ex. 1017, 12. The district court also initially construed "second server" as a "server that is not the client device." Pet. 17. Later, the court granted defendants' request for clarification as to the scope of this construction, and determined that a "second server" is "a device that is operating in the role of a server and that is not the first client device." *Id.*; Ex. 1020, 8, 11.

Patent Owner now proposes constructions for the claim terms "client device" and "second server" that are different than those determined by the district court in the Teso Litigation. *See* PO Resp. 23–31. We discuss Patent Owner's proposed constructions below.

    *1.    Client Device*

In our Institution Decision, we concurred with the district court's reasoning and agreed with its construction for the claim term "client device" as a "communication device that is operating in the role of a client." Dec. 17–18.

In its Response, Patent Owner contends that a person of ordinary skill in the art "would understand the term 'client device' to mean a 'consumer computer,'" or alternatively, "would understand the term 'client device' to mean a 'consumer communication device.'" PO Resp. 23. Patent Owner

12

argues that "[t]hese proposed constructions are consistent with the claim language, the specification, and the prosecution histories distinguishing client devices and servers." *Id.*

Patent Owner's proposed construction of the claim term "client "device" as a "consumer computer," however, was previously considered, and rejected, by the district court in the Teso Litigation. *See, e.g.*, Ex. 1017, 10–12. Patent Owner takes issue with the evidence and the reasoning used by the district court to reject Patent Owner's previously proposed construction. *See, e.g.*, PO Resp. 23–28.

Patent Owner argues that the district court's rejection of its proposed construction of a "client device" as "consumer computer" is wrong for three reasons. *Id.* at 23–25. First, Patent Owner asserts that, although the district court found that there was no express lexicography in the specification, the specification states that "computers of consumers" are "referred to herein as client devices" and the term "client device" is used in the claims. *Id.* at 23 (citing Ex. 1001, 2:47–49). Patent Owner asserts that "the term 'client device' has a special meaning in the context of the '510 Patent" and that, therefore, upon reading the specification, a person of ordinary skill in the art "would understand a 'client device' is a consumer computer in the context of the '510 Patent." PO Resp. 24 (citing Ex. 2065 ¶ 114).

Second, Patent Owner disagrees with the district court's finding that in the specification the term "consumer" refers to a consumer of content as opposed to a broadcaster of content. PO Resp. 24 (citing Ex. 1017, 11). Patent Owner argues, instead, that the common understanding of "consumer" is "a person who buys goods or services for their own use" or

IPR2022-00916
Patent 10,484,510 B2

"someone who buys goods or services for personal use." PO Resp. 24 (citing Ex. 2007; Ex. 2035, 5; Ex. 2036, 4; Ex. 2008; Ex. 2037, 4; Ex. 2065 ¶ 121.

Third, Patent Owner disagrees with the district court's finding that the term "consumer" does not appear in connection with the description of the claimed invention, contending instead that the specification "defines client devices as consumer computers." PO Resp. 25.

Patent Owner argues that a person of ordinary skill in the art "would understand a client device is a 'communication device' in the context of the specification," and that "a client device is a consumer computer with specific software to operate in accordance with the claims." PO Resp. 26 (citing Ex. 2065 ¶¶ 115, 116; Ex. 1017; Ex. 1020; Ex. 2006; s*ee also* Ex. 1001, 4:56–52; 5:23–31; 9:14–51). Patent Owner argues that "[i]n the context of the specification, a client device would be understood to be, more specifically, a consumer computer like a laptop, desktop, tablet, or smartphone." PO Resp. 26 (citing Ex. 2065 ¶ 120). Patent Owner further argues that a person of ordinary skill in the art "would understand that a client device is typically portable and easily moved, like, for example, a laptop, desktop, tablet or smartphone." PO Resp. 26 (citing Ex. 2065 ¶ 124).

Patent Owner also argues that a person of ordinary skill in the art

> would understand that a client device is typically understood (a) to be regularly switched off and taken offline; (b) to be capable of processing only a limited number of requests at any given time, which may for example include a single user login; and/or (c) to have lesser fault tolerance, lesser reliability, and lesser scalability, prioritizing value to client device users over system costs. EX.2065 at ¶125.

14

IPR2022-00916
Patent 10,484,510 B2

PO Res. 27. "These client device-attributes," Patent Owner argues, "distinguish a client device from a server." *Id.*

Patent Owner argues that a person of ordinary skill in the art "would understand there are structural differences between client devices and servers in the context of the specification and there is no contradictory disclosure in the specification or in the prosecution histories." *Id.* at 28 (citing Ex. 2065 ¶ 128). "Rather," Patent Owner argues, "client devices are repeatedly distinguished from servers in the specification and the prosecution histories." PO Resp. 28.

We have considered Patent Owner's evidence and arguments that the district court's construction of the claim term "client device" is incorrect. For the reasons discussed below, however, we determine that the evidence of record supports the district court's construction of the term "client device" as a "communication device that is operating in the role of a client" that we adopted in our Institution Decision and continue to apply here. Conversely, we find that the evidence does not support Patent Owner's view that a "client device" is a "consumer computer," or alternatively, a "consumer communication device," where the "client device" cannot be a server.

a)  <em>Claim Language</em>

Under *Phillips*, we begin with the language of the claims themselves. *See Phillips*, 415 F.3d at 1314. In claim 1, the steps of the claims are performed by a "first client device." In step 1[b], the first client device, "send[s], to the web server over the Internet, the first content identifier," which serves to request content from the web server. *See* Ex. 1001, 19:24–25. In step 1[b], the first client device is acting as a client in requesting

15

IPR2022-00916
Patent 10,484,510 B2

content.  In step 1[d], the first client device "send[s] the received first content, to the second server."  *See id*. at 19:29–30.  In step 1[d], the first client device is acting as a server to forward content.

The parties address the issue that the "first client device" acts in differing roles in claim 1.  Petitioner asserts that the claim's required functionality is consistent with the district court's determinations on the role-based nature of the term.  Pet. Reply 13–14.  Patent Owner notes that under a role-based construction, "a client device may operate in the role of a server at some points in time."  PO Resp. 25.

According to Petitioner, in district court Patent Owner "affirmatively argued in its claim-construction brief that the claimed 'second server' mapped to the Client 102 role (in green) and the 'client device' mapped to the Agent 122 role (in red), per PO's annotated Figure 3 below," confirming a role-based construction.  Pet. Reply 14–15.

IPR2022-00916
Patent 10,484,510 B2



**FIG. 3**

Patent Owner's annotated Figure 3, above, presented in the district court litigation equates the claimed "first client device" (shown in red) to agent 122, which sends the first content identifier to the web server (arrow C), receives content requested from the web server (arrow D), and sends that content to client 102 (the second server shown in green) (arrow E). Ex. 1126, 4. Thus, given this understanding, the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102 in response to a request for the content from client 102.

IPR2022-00916
Patent 10,484,510 B2

This reflects a role-based interpretation of the claim terms; different devices are defined by their function and can be either clients or servers depending on the function they perform.

Patent Owner argues that "the district court briefing was taken out of context and merely used to illustrate the lines of communication." PO Sur-reply 9, n.4 (citing PO Resp. 6–7, n.1). We do not agree. We find that the district court testimony speaks for itself and is consistent with the role-based nature of the "first client device" and "second server" claim terms.[7]

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function of a component serves to define the term. Ex. 1020, 7–10. For instance, the district court found that, under the steps of claim 1, the "client device" operates as an intermediary to perform steps including "sending, to [a] web server over an Internet, the first content identifier" to request content and also to "send[] the received first content." Ex. 1017, 3–4. Consistent with the claim language, the district court recognized that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first

---

[7] We note that Patent Owner's argument that "a server is not a client device and that a client device is not a server" (PO Resp. 15) is not supported by the claim language, which describes a "client device" that acts as a client to request content from the web server as well as a server to forward content. We discuss this issue in more detail below.

18

IPR2022-00916
Patent 10,484,510 B2

server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted). That is, although the district court determined that a single component could not simultaneously serve more than one function at any particular time, components could operate in different roles, such as the claimed "client device." *Id*. We agree with the district court's construction of "client device" as "a device that is operating in the role of a client" because this interpretation is consistent with the limitations of the claims. *See id.* at 10–11.

> b)    *Specification*

The district court's interpretation of the term "client device," adopted here, is also consistent with the '510 patent specification. The specification, when describing the "multiple communication devices" depicted in Figure 3, states that the same components may assume different roles: "[d]ue to the functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent, depending upon the requirements of the network." Ex. 1001, 4:47–52 (emphases added). Accordingly, the specification states that the components identified in Figure 3 may play different roles that perform different functions based on their stored software. *Id*.

Moreover, a communication device as described in the '510 patent includes memory 210, which stores software 212 with accelerator application 220, which includes client, peer and agent modules. *See* Ex. 1001, 5:60–6:42, 9:21–27, Fig. 4, Fig. 6). The specification explains that "each of the [software modules] comes into play *according to the specific*

19

IPR2022-00916
Patent 10,484,510 B2

*role that the communication device 200 is partaking* in the communication network 100 *at a given time*." *Id.* at 9:21–26 (emphasis added). The specification thus supports the role-based function of the network components, with components operating in different roles at different times, which is consistent with the claim language.

In opposition, Patent Owner argues that a person of ordinary skill in the art, when considering Figures 1 and 3 of the '319 patent, would understand that a server is not a client device and that a client device is not a server. PO Resp. 15. Patent Owner argues that proxy server 6 of Figure 1 "must be structurally different from agent 122 of Figure 3," and that "purely role-based constructions do not account for the structural differences between a proxy server (in Figure 1) and a proxy client device (in Figure 3) and therefore, the purely role-based constructions are not appropriate." *Id.*

For example, Patent Owner asserts with respect to Figure 1 that "proxy server 6 (i) receives requests from client devices 14, 16 and (ii) sends requests to web server 32." PO Resp. 16 (citing Ex. 2065 ¶ 86). Patent Owner argues that if a person of ordinary skill in the art "were to apply the purely role-based constructions, proxy server 6 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.*

Patent Owner makes a similar argument with respect to Figure 3. With respect to Figure 3, Patent Owner asserts that "agent 122 (i) receives requests from client devices and (ii) sends requests to web server 152." PO Resp. 17 (citing Ex. 2065 ¶ 91). Patent Owner argues that if a person of ordinary skill in the art "were to apply the purely role-based constructions,

IPR2022-00916
Patent 10,484,510 B2

agent 122 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.*

Patent Owner's expert, Dr. Williams, testifies that if a person of ordinary skill in the art "were to apply the purely role-based constructions, proxy server 6 (in Figure 1) and agent 122 (in Figure 3) would be operating in the same roles at a given point in time," and that "there is nothing to distinguish the architecture of Figure 1 and Figure 3." Ex. 2065 ¶ 93. According to Dr. Williams, purely role-based constructions are not appropriate because they fail to account for structural differences between proxy servers and proxy client devices. *Id.* ¶ 94.

We do not find that the evidence of record supports Patent Owner's assertions on this issue. Dr. Williams's testimony, and Patent Owner's arguments, are based upon a modified version of Figure 3, which inserts "proxy server 6" between "client device" and "agent." Patent Owner's modified version of Figure 3 is shown below. *See* PO Resp. 7–8.

IPR2022-00916
Patent 10,484,510 B2



Patent Owner's modified version of Figure 3, shown above, inserts "proxy server 6" outlined in green, between "client 102" outlined in purple and "agent 122" outlined in red. Patent Owner's modified configuration of Figure 3 is not shown in any figure of the '510 patent or disclosed anywhere in the specification. Dr. Williams testifies that a person of ordinary skill in the art "would understand that proxy server 6 of Figure 1 *could be* inserted between client 102 and agent 122 of Figure 3." Ex. 2065 ¶ 59 (emphasis added). Dr. Williams combines the "proxy server 6" of the prior art shown in Figure 1 and an embodiment of the claimed invention depicted in Figure 3. *See* Ex. 1001, 2:8–18, 2:24–32, 4:41–50. Dr. Williams, however, provides no explanation or rationale for combining the prior art with an

embodiment of the claimed invention. Further, Dr. Williams testifies that different "client devices," i.e., a "requesting client device" and a "proxy client device" are disclosed (*see* Ex. 2065 ¶ 59), but we do not discern that these characterizations are described in the '510 specification. In view of the lack of support, we afford little weight to Dr. Williams's testimony on this issue.

Thus, in view of the '510 patent specification, we do not agree with Patent Owner that it discloses the architecture of a requesting client (102) ↔ proxy server (6) ↔ agent (122) ↔ web server (152), as Patent Owner asserts. *See* PO Resp. 7–8. Moreover, we do not agree that Patent Owner's argument that the "architecture" should govern the construction of "client device" in light of the claim language and the specification's disclosures demonstrating that communications devices may serve in different roles due to the functionality provided by software stored within each communication device, which come into play depending on the specific role that the communication device takes at a given time. *See* Ex. 1001, 4:46–50, 9:20–25. The district court agreed, finding that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* litigation (Ex. 2012) are consistent with its understanding of the architecture required by the claims of the '510 patent and its "novel" use of a client device as an intermediary. PO Resp. 12–13. We do not find that the district court's *Alice* order alters or modifies the claim construction

IPR2022-00916
Patent 10,484,510 B2

the court adopted there, and that we adopt here. The *Alice* order addressed patent eligibility, not claim construction. *See* Ex. 2012. Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as a "communication device that is operating in the role of a client," and did not modify that construction. *Id.* at 5. Further, after the *Alice* order issued, in February 2021, the district court consistently maintained its claim constructions. *See* Exs. 1020, 1115.

We agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server." Ex. 1112, 13. Petitioner points to buttressing evidence in RFC 2616, which defines a "server" as an "application program that accepts connections in order to service requests by sending back responses," where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." Pet. Reply 15 (citing Ex. 1013, 9 (emphases omitted)). We agree with Petitioner that RFC 2616 serves as intrinsic evidence because it is cited in the '510 patent in its discussion on the operation of the agent, client, or peer, particularly, in how these devices can use the HTTP protocol to determine whether an HTTP request they have received is still valid. Ex. 1001, 16:21–28; *see V-Formation v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005). Accordingly, we determine that the weight of the evidence supports the

IPR2022-00916
Patent 10,484,510 B2

conclusion that a "client device" as recited in the claims of the '510 patent may act as a server as well as a client.

Patent Owner also asserts that the term "client device" means "consumer computer" which is distinct from a server, and that a person of ordinary skill would understand a "consumer computer" to be "a laptop, tablet, or smartphone." PO Resp. 25. Patent Owner asserts that a person of ordinary skill in the art "would understand that a client device is typically portable and easily moved," and "is not a dedicated network element, unlike a server," and "typically uses a single or relatively few connections." *Id.* at 26. Patent Owner cites to Dr. Williams' testimony as support for these assertions. *See* Ex. 2065 ¶¶ 114–125.

Dr. Williams testifies that his understanding is "consistent with the claim language, the specification, and the prosecution histories distinguishing servers from client devices." *Id.* ¶ 114. We discuss the prosecution history below, but note here that Dr. Williams does not identify any specific portions of the '510 specification that supports Patent Owner's assertions as to the alleged structure and nature of the client device. Rather, Dr. Williams merely asserts that "[i]n my opinion a POSA would understand" or other similar statement. *See, e.g.,* Ex. 2065 ¶¶ 124–128.

Dr. Williams testifies that a person of ordinary skill in the art "would understand the term 'client device' to mean a 'consumer computer'" because the '319 specification states that "files are stored on computers of consumers, referred to herein as client devices." *Id.* ¶ 114 (citing Ex. 1001, 2:47–49); *see also* PO Resp. 23. Our view is that the Patent Owner takes the specification's disclosure out of context. The "computers of consumers"

IPR2022-00916
Patent 10,484,510 B2

discussed are computers used in the prior art peer-to-peer filing sharing system known as BitTorrent. Ex. 1001, 2:43–61. The '510 specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the invention. *See id.* at 2:43–3:6, 4:3–4, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the description of the claimed inventions." Ex. 1017, 11 (emphasis omitted). We also agree with the district court's finding that the specification discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. *Id.*; *see also* Ex. 1001, 1:57–62; PO Resp. 24.

Accordingly, we find that the '510 patent's specification disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client" as construed by the district court and as adopted here. We also find that the '510 patent's specification does not support Patent Owner's assertion that a person of ordinary skill in the art would understand the term "client device" to mean a "consumer computer" or a "consumer communication device."

c)     *Prosecution History*

Patent Owner argues that the prosecution history of the '510 patent, its parent (the '319 patent), and its grandparent (U.S. Patent No. 10,069,936 ("the '936 patent")), support the conclusion that the claimed "client device" should be distinguished from a server. PO Resp. 18–23.

IPR2022-00916
Patent 10,484,510 B2

Patent Owner points to statements in the prosecution history of the '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection. *Id.* at 19–21. More specifically, Patent Owner asserts that the applicant argued that the cache server 306 of Garcia "is clearly a dedicated device and performs a server functionality. The Garcia reference is silent, and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id.* at 19 (citing Ex. 2009, 215 (emphasis omitted)).

Patent Owner contends that "[t]he examiner recognized a server cannot be equated to a client device regardless of the role being performed at a given moment in time." PO Resp. 20 (citing Ex. 2065 ¶ 99). Patent Owner points out that in the Notice of Allowance, the examiner stated that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art," and further asserts that "[t]he examiner's acknowledgement of the 'environment' in which the claims operate shows that the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture. PO Resp. 21 (quoting Ex. 2009, 44; citing Ex. 2065 ¶ 102).

The claims that were under consideration in the '936 patent prosecution, however, were significantly different than the claims at issue here. The issued claims in the '936 patent recite "requesting client" and a separate "client" and have multiple steps that differ from those of the '510 patent. *See, e.g.*, Ex. 2011, 19:16–52. Given these differences, we discount the applicability of statements made during the patentability assessment of

27

IPR2022-00916
Patent 10,484,510 B2

the '936 patent prosecution to the assessment of claim construction for the '510 patent.[8]   Further, considering the varying terms used, we do not find that the applicant's statements during prosecution distinguishing a recited "device" or "client" from the devices disclosed in Garcia are sufficient to act as a disclaimer of the scope of the "client device" term as used in the claims of the '510 patent here.  *In re Am. Acad. Of Sci. Tech Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004); *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction.").  Also, the examiner's statements do not reflect an understanding of any disavowal of the scope of any claim terms.

Additionally, as discussed above, the '510 patent's claim language and specification clearly support a role-based interpretation of the term "client device."  In contrast, the '936 patent prosecution is for a grandfather of the '510 patent and involved evolving claim term amendments.  *See Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365, 1375 (Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the plain language of the claims and the direct teaching of the specification.").  For this reason, we find the '969 prosecution history to be less pertinent to the construction of the '510 patent claims than the claim language and specification of the '510 patent itself.  As the Federal Circuit has explained, the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often

---

[8] We note that although the examiner found that Garcia alone did not teach some steps of the claim, the examiner nonetheless found that Garcia alone taught a "client" for many of the limitations. Ex. 1072, 314, 593–594.

IPR2022-00916
Patent 10,484,510 B2

lacks the clarity of the specification and thus is less useful for claim construction purposes. *See Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim construction); *Phillips*, 415 F.3d at 1317. This is particularly true here, where the prosecution history at issue involves a grandfather application with different claims having different claim language from the patent and claims under review.

Patent Owner also presents arguments based on the prosecution history of the '319 patent, which is a parent to the '510 patent. PO Resp. 21–22. Patent Owner refers to applicant's argument that "the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id.* at 21 (citing Ex. 2066, 282). Patent Owner cites to the examiner's statement in the Notice of Allowance that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification." PO Resp. 22 (citing Ex. 2066, 50).

Patent Owner's arguments based on the '319 patent prosecution concern patent eligibility, not claim construction. Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated disclaimer of the scope of the claim term "client device."

IPR2022-00916
Patent 10,484,510 B2

Patent Owner additionally refers to the prosecution history of the '510 patent and again references the examiner's statement that the "environment" of the claimed methods supported patentability. PO Resp. 22 (citing Ex. 1002, 41). We do not discern that there is any disavowal of claim scope by the applicant in the prosecution history of the '510 patent, nor does the examiner indicate an understanding of any disclaimer.

### d) Conclusion

Based on the evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

### 2. Second Server

In our Institution Decision, we concurred with the district court's reasoning and agreed with its clarified construction of the claim term "second server" as a "device that is operating in the role of a server and that is not the client device." Dec. 18–19.

Patent Owner appears to propose that a server is not a client device, and, more specifically, that a server is structurally different than a client device. *See* PO Resp. 28. Patent Owner's arguments, for the most part, repeat the same arguments presented for "client device." *See id.* at 28–31. That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer ↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a consumer computer and would be a commercial device with certain operational properties. *Id.*

30

IPR2022-00916
Patent 10,484,510 B2

We continue to agree with the district court's interpretation of the claim term "second server," which we have adopted, because it is consistent with the evidence of record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is operating in the role of a server." Ex. 1017, 14; Ex. 1020, 8. This construction is consistent with the role-based interpretation of the claim components, which we discuss in Section II.C.1, above. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, but is able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the received first content, to the second server" in limitation 1[d], so the "second server" has to be a separate component.

We have addressed the majority of Patent Owner's arguments in Section II.C.1, above, that concern alleged required architecture, structural requirements, and the assertion that a "client device" cannot be a server. Additionally, Patent Owner argues that in the *NetNut* litigation, the district court stated that it "hereby expressly rejects Defendant's proposal of referring generically to 'a device,'" and that the server "is not the client device," so client devices and servers are distinguished. PO Resp. 11 (citing Ex. 2006, 23). We do not agree with this argument because, in context, the district court there only indicated that the use of the term "device" was too generic with regard to the term "server," which we take to mean that the

31

IPR2022-00916
Patent 10,484,510 B2

server had to be capable of acting in the role of a server, and that a device could not "act as a server and as a client simultaneously." Ex. 2013, 20–21.

Patent Owner also argues that the district court indicated that a "server" is not a communication device. PO Resp. 28 (citing Ex. 2065 ¶ 133). However, the district court found, and we agree, that "a component can be *configured* to operate in different roles," so long as it does not serve in different roles simultaneously, and although the specification does "not include servers as a type of 'communication device,' that is not sufficient to construe 'client device' as unable to act as a server in all cases." Ex. 1020, 10. Additionally, in view of the role-based construction for the components, we reject Patent Owner's other arguments on required structure and characteristics of a server. *See* PO Resp. 28–31.

## D. Prior Art References

### 1. Crowds (Ex. 1006)

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions." Ex. 1006, 2. In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server. *Id.* In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator." *Id.* In Crowds, "[a] user is represented by a process on her computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)." *Id.* at 8. "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd." *Id.*

IPR2022-00916
Patent 10,484,510 B2

Exemplary paths for web requests from crowd users are shown in Figure 2 (*id*. at 9), reproduced below:



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." *Id.* at 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "1 → 5 → server; 2 → 6 → 2 → server; 3 → 1 → 6 → server; 4 → 4 → server; 5 → 4 → 6 → server; and 6 → 3 → server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

   2. *Border (Ex. 1012)*

Border is a patent titled "System and Method of Reading Ahead of Objects for Delivery to an HTTP Proxy Server." Ex. 1012, code (54). Border describes "a system for retrieving web content." *Id.* at code (57). In Border, "[a] downstream proxy server receives a URL request message from

IPR2022-00916
Patent 10,484,510 B2

a web browser. *Id.* at 3:35–36. Thereafter, "[a]n upstream proxy server receives the URL request message from the downstream proxy server" and "selectively forwards the URL request message to a web server and receives the URL content from the web server." *Id.* at 3:38–42. Then, "[t]he upstream proxy server forwards the URL content to the downstream proxy server." *Id.* at 3:42–43. An exemplary system employing downstream and upstream proxy servers for accessing a web server is shown in Figure 1, reproduced below:

*FIG. 1*



As depicted in Border's Figure 1, user station 101, for example, a personal computer, uses standard web browser 103. *Id.* at 3:55–61. User station 101 is connected to downstream proxy server 105, which communicates over network 111 with upstream proxy server 107. *Id.* at 3:61–66. Proxy servers 105 and 107 are HTTP proxy servers with HTTP caches 115 and 117. *Id.* at 4:8–11. Upstream proxy server 107 is connected to web server 109 through

IPR2022-00916
Patent 10,484,510 B2

IP network 113, for example, the Internet. *Id.* at 4:5–7. In this system,
proxy servers 105 and 107 "act as an intermediary between one or more
browsers and many web servers (e.g., server 109)." *Id.* at 4:30–31.

       3.     *MorphMix (Ex. 1008)*

MorphMix is a doctoral thesis that identifies the lack of anonymity on
the Internet as a problem that "limits the privacy protection of Internet
users." Ex. 1008, Abstract. Accordingly, MorphMix is focused on
"achieving anonymous Internet access for low-latency applications such as
web browsing." *Id.* MorphMix describes "a peer-to-peer-based mix
network" where "[e]very node joining the system can itself establish circuits
via other nodes to access a server anonymously, but can also be part of
circuits established by other nodes and relay data for them at the same time."
*Id.* at 118. An exemplary system is illustrated in Figure 5.1, reproduced
below:

IPR2022-00916
Patent 10,484,510 B2



**Figure 5.1:** *Basic idea of MorphMix.*

As depicted in Figure 5.1 of MorphMix, participating nodes have a virtual link to one or more other nodes at any time. Ex. 1008, 119. This "means that (1) there is a TCP [Transfer Control Protocol] connection between the two nodes and (2) they share a symmetric key that is only known to these two nodes." *Id.* In Figure 5.1, node *a* has five neighbors with which it has established virtual links. *Id.* In the example shown, "node *a* has established an anonymous tunnel via *b* and *c*." *Id.* "Within an anonymous tunnel, anonymous connections can be set up to anonymously communicate with a server." *Id.* at 120.

    4.    *RFC 2616 (Ex. 1013)*

RFC 2616 is a request for comments document concerning version 1.1 of the Hypertext Transfer Protocol (HTTP), which is "foundational to the World Wide Web." Pet. 23; Ex. 1005 ¶ 53. HTTP is an application-level

IPR2022-00916
Patent 10,484,510 B2

protocol for distributed, collaborative, hypermedia information systems. Ex.
1013, 1. HTTP is a generic, stateless, protocol which can be used for many
tasks beyond its use for hypertext, such as name servers and distributed
object management systems. *Id.* RFC 2616 specifies Internet standards
track protocol for the Internet community, and requests discussion and
suggestions for improvements. *Id.*

E.  *Anticipation Based on Crowds*

1.  *Claim 1*

*Preamble*

The preamble of claim 1 reads as follows:

*A method for use with a web server that responds to Hypertext
Transfer Protocol (HTTP) requests and stores a first content
identified by a first content identifier, the method by a first client
device comprising:*

Ex. 1001, 19:18–21.

Petitioner explains that in Crowds,

[a] user's request to a web server is not passed directly to the web
server, but instead to a random member of the crowd, who either
submits the request directly to the web server or forwards it
again. The web request is eventually submitted to the web server
by a random [crowd] member.

Pet. 24.

Petitioner's annotated Figure 2 from Crowds is shown below.

IPR2022-00916
Patent 10,484,510 B2



Figure 2 of Crowds (annotated

*Id.* at 25.

Petitioner asserts that its annotated Figure 2 from Crowds, above, "shows an example from Crowds path with one possible path, '5→4→6→server,' highlighted in green." *Id.* Petitioner asserts that "[i]n accordance with the preamble, a first client device (jondo 6) performs the claim steps, fetching requested content from a web server, "5". *Id.* According to Petitioner, "[t]he web server stores the first content." *Id.* at 26. (citing Ex. 1006, 74–75 (referring to web server "replies"), 85, Fig. 3 (referring to pages and 1-kilobyte embedded images resident on a web server), 88–89 (responding to HTTP requests). Petitioner explains that "jondo 6 corresponds to the first client device in the preamble, and the first content on the web server is identified by a first content identifier (a URL)." 6 (citing Ex. 1005 ¶¶ 55–58).

With respect to the preamble, Patent Owner argues that "Crowds does not disclose a 'first client device' as recited in the preamble of claim 1 under

the purely role-based constructions." PO Resp. 31 (citing Ex. 2065 ¶ 152). Patent Owner argues that "[t]here is no way for a [person of ordinary skill in the art] to determine whether jondo 6 is a client device or a server under the purely role-based constructions because . . . jondo 6 operates in different roles at different points in time." *Id.* Patent Owner argues that "[t]he 'first client device' is necessarily and consistently a client device during the performance of method claim 1," and that "[f]or at least this reason, Crowds does not disclose the preamble of claim 1." *Id.* at 31–32 (citing Ex. 2065 ¶¶ 144–150).

We disagree with Patent Owner because Patent Owner's arguments reject the role-based claim construction adopted by the district court and applied here, wherein the recited "client device" is a "communication device that is operating in the role of a client." Patent Owner's argument improperly limits the operation of the "client device" to a single role, even though the district court recognized, consistent with the claim language, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

We, therefore, agree with Petitioner that Crowds meets the subject matter recited in the preamble.

> a)    establishing a Transmission Control Protocol
> (TCP) connection with a second server;

Petitioner contends that "Crowds discloses establishing a TCP connection between jondo 6 (first client device) and jondo 4 (the second

server).” Pet. 26. Petitioner asserts that “[j]ondo 6 may be regarded as a client device in the example path (and thus the first client device) for at least the reason that (under the court's construction) it acts as in the role of a client in requesting the service of content from web server 5.” *Id.* Petitioner also asserts that “[j]ondo 4 may be regarded as a server (and thus the second server) for at least the reason that jondo 4 provides a service to requesting jondo 5.” *Id.* Petitioner points out that “Crowds explains that “[its] description uses client-server terminology, where one jondo is a client of its successor on the path.” *Id.* ( citing Ex. 1006, 74). Referring to Crowds annotated Figure 2 (shown above), Petitioner argues that “jondo 5 is thus a client of jondo 4 (its successor on the path), and by the same ‘client-server terminology,’ jondo 4 serves in the role of a server to jondo 5.” Pet. 26.

Petitioner points out that “Crowds refers to jondos throughout as having involvement in the role of a server, with statements such as ‘[l]ike all network servers, jondos are identified by their IP address and port number.’” *Id.* at 26–27 (citing Ex. 1006, 90). Petitioner argues that “[j]ondo 4 may be regarded as a server under this disclosure.” Pet. 27 (citing Ex. 1005 ¶¶ 59–63).

Petitioner also asserts that “Crowds discloses communicating over a ‘static path’ of jondos, that is, ‘one path for all its users’ communications.’” Pet. 27 (citing Ex. 1006, 80–81). Petitioner asserts that “Crowds discloses that this path is established when jondo 5 receives a user request from a browser.” Pet. 27 (citing Ex. 1006, 73). Petitioner argues that Crowds “sets up these static paths over TCP, as reflected when it states that such a path would be ‘altered when failures are detected in the path,’ including where

IPR2022-00916
Patent 10,484,510 B2

'the TCP/IP connection to the jondo breaking or being refused.'" Pet. 27
(emphasis omitted) (citing Ex. 1006, 81). "This disclosure," Petitioner
argues, "reflects that the static path over jondos as discussed in Crowds
comprises TCP/IP connection between the jondos. Therefore, a TCP
connection is established between the first client device and the second
server, which are both jondos in the example path." Pet. 27.

Patent Owner argues that "[t]he portions of Crowds cited and relied
upon by Petitioner only disclose establishing a TCP connection in the
context of a jondo sending a request for content." PO Resp. 32 (citing Pet.
26–27; Ex. 2065 ¶ 154; Ex. 1004, 8). Patent Owner argues that "when jondo
6 receives a request from jondo 4, jondo 6 is operating in the role of a server,
not a client." PO Resp. 32 (citing Ex. 2065 ¶ 156). "Therefore," Patent
Owner concludes, "jondo 6 cannot be a client device during performance of
this method step." *Id.*

"Moreover," Patent Owner argues, "when jondo 4 sends a request to
jondo 6, jondo 4 is operating in the role of a client, not a server." PO Resp
32 (citing Ex. 2065 ¶ 157). "Therefore," Patent Owner concludes, "jondo 4
cannot be a server during performance of this method step." *Id.*

We disagree with Patent Owner's argument for several reasons. First,
Patent Owner's argument requires the recited "client device" to operate in a
client role at all times and that the recited "second server" must operate in a
server role at all times. But such a rigid restriction on the operational roles
of the client device and the second server are contradicted by the express
language of claim 1 and would make claim 1 incapable of being practiced.
For example, claim 1 expressly requires that "a first client device . . .

IPR2022-00916
Patent 10,484,510 B2

receive[] the first content from the web server," and also expressly requires that the "first client device . . . send[] the received first content, to the second server." Thus, claim 1 expressly requires that the "first client device" must sometimes operate in the role of a "client" and must also sometimes operate in the role of a "server."

Second, Patent Owner's rigid application of operational roles is inconsistent with the claim construction adopted by the district court and applied here. The district court expressly acknowledged, and we agree, that consistent with the claim language "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Accordingly, we agree with Petitioner that Crowds discloses the subject matter recited in limitation 1[a].

> b)    sending, to the web server over an Internet, the
>        first content identifier;

Petitioner contends limitation 1[b] is disclosed by Crowds. Petitioner explains that "[i]n the example '5→4→6→server' path, the 'first client device' (jondo '6') sends the web request via HTTP to the target web server." Pet. 27 (citing Ex. 1006, 73–74, Fig. 2). Petitioner illustrates this step by annotating Figure 2 of Crowds, shown below.

IPR2022-00916
Patent 10,484,510 B2



Figure 2 of Crowds (annotated)

Petitioner explains that its annotated Figure 2 of Crowds, shown above, illustrates "[c]ircled in red . . . the step corresponding to first client device [jondo 6] sending to the web server [5] the HTTP request comprising the first content identifier ('FCI')." According to Petitioner, "[t]he arrows in Fig. 2 of Crowds each represent 'requests,' *i.e.*, requests for content residing on a web server, originating from one of the jondos and forwarded over a randomized path of jondos to the web server." Pet. 28 (citing Ex. 1006, 73).

Petitioner explains that "[t]he web server responds to the 'request' by returning the requested content." *Id.* (citing Ex. 1006, 73–74; Ex. 1005 ¶¶ 66–68). Petitioner asserts that "the 'request' itself may be regarded as the FCI," and that "each 'request' contains a URL." Pet. 28–29. According to Petitioner, "[t]he 'requests' are HTTP requests as understood by [a person of ordinary skill in the art], as reflected, *e.g.*, where Crowds notes that the requests have 'HTTP headers,'" because "[a]n HTTP request for content

available from a web server by definition contains a URL." *Id.* at 29–30 (emphasis omitted) (citing Ex. 1005 ¶¶ 70–71; Ex. 1006, 90).

Petitioner concludes that "the FCI limitation in this claim step may be considered met by either the disclosed 'request' itself, or the URL that the request contains." Pet. 30 (citing Ex. 1005 ¶ 72).

Patent Owner does not specifically dispute Petitioner's evidence and arguments with respect to limitation 1[b]. *See* PO Resp. 31–36.

We agree with Petitioner that Crowds discloses the subject matter described in limitation 1[b]. Petitioner's arguments are supported by the testimony of Mr. Teruya, which we credit. *See* Ex. 1005 ¶¶ 66–72. Mr. Teruya explains that in Crowds, a user (jondo) can begin browsing the Internet anonymously by making a "request" to a web server by opening a URL, where other jondos are acting as the user's HTTP proxy for the browser. *See id.* ¶ 70 (citing Ex. 1006, Fig. 6). Mr. Teruya explains that in Crowds, the "requests" are HTTP requests because they have HTTP headers and under the standards for HTTP protocol, HTTP requests for content from a web server contain a URL. Ex. 1005 ¶ 71 (citing Ex. 1006, 90; Ex. 1013 § 5.1.2).

> c)    *receiving, the first content from the web server over the Internet in response to the sending of the first content identifier;*

Petitioner contends limitation 1[c] is disclosed by Crowds: "Having made the content request of the web server per step (b), jondo 6 now receives the requested content in response, per step (c)." Pet. 30. Petitioner explains that "the 'first client device' (jondo '6') sends the FCI to target web server '5'. The last jondo in the path then receives the 'first content,' such

IPR2022-00916
Patent 10,484,510 B2

as the user specified web page." *Id.*  Petitioner further explains that "[t]he initiating jondo establishes the random path of jondos 'that carries its users' transactions to **and from** their intended web servers.'" *Id.* (citing Ex. 1006, 73).  "Further," Petitioner explains, "server replies traverse the **same path as the requests, only in reverse**."  Pet. 30 (citing Ex. 1006, 74). "Accordingly," Petitioner explains, "the first client device in Crowds (the last jondo in the path before the target web server) receives the requested web page (first content) for sending back down the path to the requesting user." Pet. 30 (citing Ex. 1005 ¶¶ 73–75).

Patent Owner does not specifically dispute Petitioner's evidence and arguments with respect to limitation 1[c].  *See* PO Resp. 31–36.

We agree with Petitioner that Crowds discloses the subject matter described in limitation 1[c].  Petitioner's arguments are supported by the testimony of Mr. Teruya, which we credit.  *See* Ex. 1005 ¶¶ 73–75.

> d)      *sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier*

Petitioner contends this step is disclosed by Crowds, because "[a] TCP connection exists between jondos '6' and '4', as part of the specified 'path.'" Pet. 31; *see also id.* at 27–30 (limitation (b)).

Petitioner explains that "[a]s also discussed above, the first client device (jondo '6' in the above example path) receives the first content from the web server, and the random path of jondos 'carries its users' transactions to **and from** their intended web servers,' and 'server replies traverse the **same path as the requests, only in reverse**.'"  Pet. 31 (citing Ex. 1006, 73–74).  Petitioner explains that "jondo '6' sends the first content (web page

45

IPR2022-00916
Patent 10,484,510 B2

content) back to the second server (here, jondo '4,' the prior jondo)," and

"[j]ondo '4' can then send the web page content back to the requesting user

(here, jondo '5')." Pet. 31 (citing Ex. 1005 ¶¶ 76–78).

> Patent Owner argues that

> Petitioner fails to apply the purely role-based constructions at the particular point in time, for the particular transaction, recited in step 4 of claim 1. EX.2065 at ¶160.

> Under the purely role-based constructions, when jondo 6 is sending a response to jondo 4, jondo 6 is operating in the role of a server, not a client. EX.2065 at ¶161. Therefore, under the purely role-based constructions, jondo 6 cannot be a client device during performance of this method step. *Id.*

> Moreover, under the purely role-based constructions, when jondo 4 is receiving a response from jondo 6, jondo 4 is operating in the role of a client, not a server. EX.2065 at ¶162. Therefore, jondo 4 cannot be a server during performance of this method step. *Id.*

PO Resp. 33.

We do not agree with Patent Owner's argument. The district court's

claim construction for the "server" terms, which we adopted, makes it clear

that a server is defined by its function, not its structure. Ex. 1020, 7–11.

Thus, the district court clarified that the second server is "a device that is

*operating in the role of a server* and that is not the first client device." *Id.* at

8, 11 (emphasis added). Patent Owner's argument is unavailing because it

rigidly focuses on an alleged requirement that devices cannot operate in

different roles, an argument that was rejected by the district court in its claim

construction. Rather, the district court explained, and we agree, that "a

component can be *configured* to operate in different roles—so long as it

IPR2022-00916
Patent 10,484,510 B2

does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." *Id.* at 10 (internal quotation marks omitted).

Here, Petitioner points out, and we agree, the first client device (jondo "6" in Petitioner's example path) receives the first content from the web server, and the random path of jondos "carries its users" transactions to and from their intended web servers, and the web server's replies traverse the same path as the requests, only in reverse. *See* Pet. 31 (citing Ex. 1006, 73–74). Petitioner explains that jondo "6" sends the first content (web page content) back to the second server (here, jondo "4," the prior jondo), and jondo "4" can then send the web page content back to the requesting user, here, jondo "5." Pet. 31 (citing Ex. 1005 ¶¶ 76–78). Mr. Teruya's testimony supports Petitioner's position.

Petitioner's analysis is persuasive because it is based on the operation of jondos 4 and 6, and whether this operation meets the steps of the claimed method. In contrast, Patent Owner's opposition is based on a construction rejected by us and the district court.

We have considered Petitioner's evidence and arguments that each step of claim 1 is disclosed by Crowds, as well as Patent Owner's evidence and arguments. For the reasons discussed above, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses all the limitations of independent claim 1.

       2.    *Dependent Claims 6, 7, 15, 16, 18–24*

       a)    *Dependent Claim 6*

Dependent claim 6 recites the following limitations:

IPR2022-00916
Patent 10,484,510 B2

> *The method according to claim 1, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the third server responds to HTTP requests and stores a second content identified by a second content identifier, the method by the first client device further comprising:*
>
> *receiving the second content identifier;*
>
> *sending, to the third server over the Internet in response to the receiving, the second content identifier; and*
>
> *receiving the second content from the third server over the Internet in response to the sending.*

Ex. 1001, 19:57–67.

Petitioner contends that Crowds discloses dependent claim 6 because "Figure 2 of Crowds discloses several exemplary paths of jondos and web servers." Pet. 31. Petitioner's annotated Figure 2 of Crowds is shown below.



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Figure 2 of Crowds (annotated

*Id.* at 32 (citing Ex. 1006, 73). Petitioner explains with respect to its annotated Figure 2 of Crowds, shown above, that "[i]n addition to the

IPR2022-00916
Patent 10,484,510 B2

5→4→6→server '5' path discussed [in Petition] Section 8.1.1 (green), Crowds discloses a 3→1→6→server '3' path (in blue)." *Id.* Petitioner contends that "[f]or the same reasons the 5→4→6→server '5' path discloses Claim 1, the 3→1→6→server '3' path discloses Claim 6: jondo '6' (first client device) receives a request comprising a second content identifier from jondo '1,' which it sends to server '3' (the third server, which is a web server). Jondo '6' then receives the second content from server '3.'" *Id.* (citing Ex. 1006, 74; Ex. 1005 ¶¶ 79–81). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 79–81.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 6. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 6, in particular where Crowds discloses a 3→1→6→server "3" path, where jondo "6" (the first client device) receives a request comprising a second content identifier from jondo "1," which it sends to server "3" (the third server, which is a web server), and jondo "6" then receives the second content from server "3." Pet. 31–32 (citing Ex. 1006 73–74).

> *b)* *Dependent Claim 7*

Dependent claim 7 recites the following limitations: "*[t]he method according to claim 6, further comprising executing, by the first client device, a web browser application or an email application.*" Ex. 1001, 20:1–3.

IPR2022-00916
Patent 10,484,510 B2

Petitioner contends that Crowds discloses dependent claim 7 because "Crowds discloses every client device running a web browser as a GUI." Pet. 32 (citing Ex. 1006, 81, 88–89). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 82–86.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 6. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 7, because Crowds discloses a web browser being run by a client device (jondo). *See* Ex. 1006, 89.

c)    *Dependent Claim 15*

Dependent claim 15 recites the following limitations: "*[t]he method according to claim 1, further comprising receiving, by the first client device from the second server over the established TCP connection, the first content identifier*." Ex. 1001, 20:41–44.

Petitioner contends that Crowds discloses dependent claim 15 because "The first client device is jondo '6,' the second server is jondo '4,' and a TCP connection exists between jondo '6' and jondo '4.'" Pet. 33 (citing *id.* at 25–31 (Pet. Section 8.1.1)). Petitioner provides an annotated version of Crowds' Figure 2, shown below.

IPR2022-00916
Patent 10,484,510 B2



Figure 2 of Crowds (annotated)

With respect to Petitioner's annotated version of Crowds' Figure 2, above, Petitioner explains that "[c]olored in green . . . is the '5→4→6→server' path in Figure 2, and the red circle corresponds to the first client device (jondo '6') receiving, from the second server (jondo '4'), the first content identifier *over the established TCP connection*." Pet. 33. Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 89–91.

Patent Owner argues that "Petitioner fails to show that Crowds discloses or teaches claim 15 under either construction." PO Resp. 40 (citing Pet. 33). Patent Owner argues that "[f]or the same reasons discussed above regarding step 1 of claim 1, during performance of this method step, under the purely role-based constructions, jondo 4 is operating in the role of a client, not a server, and therefore, jondo 4 cannot be a server." *Id.* at 41 (citing Ex. 2065 ¶ 189). "Also," Patent Owner argues, "under the purely role-based constructions, jondo 6 is operating in the role of a server, not a

client, and therefore jondo 6 cannot be a client device." PO Resp. 41 (citing
Ex. 2065 ¶ 190). "Under Patent Owner's proposed constructions . . . jondo 4
is not a server." PO Resp. 41 (citing Ex. 2065 ¶ 192).

We disagree with Patent Owner. Patent Owner's argument is
unavailing because it rigidly focuses on an alleged requirement that devices
cannot operate in different roles, an argument that was rejected by the
district court in its claim construction. Rather, the district court explained,
and we agree, that "a component can be *configured* to operate in different
roles—so long as it does not simultaneously serve as more than one of: the
client device, the first server/second server, and the web server." Ex. 1020,
10 (internal quotation marks omitted).

We are persuaded that Petitioner has demonstrated by a
preponderance of the evidence that Crowds discloses the limitations of
dependent claim 15, because Crowds discloses a first client device (jondo
"6") receiving, from a second server (jondo "4"), the first content identifier
over an established TCP connection. *See* Ex. 1006, 89.

### d)    Dependent Claim 16

Dependent claim 16 recites the following limitations: "*[t]he method
according to claim 1, wherein the sending of the first content identifier to the
web server over the Internet comprises sending a Hypertext Transfer
Protocol (HTTP) request that comprises the first content identifier.*"
Ex. 1001, 20:45–48.

Petitioner contends Crowds discloses dependent claim 16 because
"jondo '6' (the first client device) sends an HTTP request to the web server
over the Internet that comprises the first content identifier." Pet. 34 (citing

IPR2022-00916
Patent 10,484,510 B2

*id.* at 25–31 (Pet. Section 8.1.1)). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 92–93.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 16, because Crowds shows that jondo 6 (the first client device) sends an HTTP request to the web server over the Internet that comprises the first content identifier. *See* Ex. 1006, 73–74, Fig. 2.

> e)    *Dependent Claim 18*

Dependent claim 18 recites the following limitations:

> *The method according to claim 1, wherein the second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates with the second server over the Internet based on, or according to, TCP/IP protocol.*

Ex. 1001, 20:52–59.

Petitioner contends that Crowds discloses dependent claim 18 because "[a] TCP connection is established between jondo '6' and jondo 4.'" Pet. 34 (*see also id.* at 25–31 (Section 8.1.1)). Petitioner explains that in Crowds, "[e]ach jondo is a client of its successor on the path (Crowds, 74), and since paths are random, a jondo may participate in different paths as a TCP client or a TCP server." Pet. 34 (citing Ex. 1005 ¶¶ 94–95). According to

IPR2022-00916
Patent 10,484,510 B2

Petitioner, Crowds "states that FTP requests must also go through the crowd. The first client device therefore also *communicates over the Internet based on . . . FTP* (as well as TCP)." Pet. 34 (citing Ex. 1006, 73 n.1). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 94–96.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 18, because Crowds explains that its path failures are detected "by the TCP/IP connection to the jondo breaking or being refused," disclosing that connections between jondos, including connections between a first client device (*e.g.* jondo 6) and a second server (*e.g.* jondo 4) are TCP/IP connections. *See* Ex. 1006, 73–74, 81, Fig. 2.

*f)*    *Dependent Claim 19*

Dependent claim 19 recites the following limitations: "*[t]he method according to claim 1, wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.*" Ex. 1001, 20:60–63.

Petitioner relies on the same evidence and arguments for dependent claim 19 as is does for dependent claim 18. *See* Pet. 34. Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 94–96.

54

IPR2022-00916
Patent 10,484,510 B2

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 19 for the reasons explained with respect to dependent claim 18.

g)     *Dependent Claim 20*

Dependent claim 20 recites the following limitations: "*[t]he method according to claim 1, wherein the first content comprises webpage, audio, or video content, and wherein the first content identifier comprises a Uniform Resource Locator (URL).*" Ex. 1001, 20:64–67.

Petitioner contends that Crowds discloses dependent claim 20 because "Crowds discloses that the first content is a web page identified by a URL." Pet. 34 (citing *id.* at 25–31 (Pet. Section 8.1.1). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 97–98.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 20 because as Petitioner explains with respect to claim 1 steps [b] and [c], in the example "5→4→6→server" path of Crowds, the "first client device" (jondo 6) sends a web request containing a URL via HTTP to the target web server 5, because as Crowds states in Figure 6, "[t]o

IPR2022-00916
Patent 10,484,510 B2

begin browsing anonymously, simply open a URL." *See* Pet. 27–30; Ex. 1006, 73–74, 88–89, Figs. 2, 6.

> h)    *Dependent Claim 21*

Dependent claim 21 recites the following limitations: "*[t]he method according to claim 1, further comprising executing, by the first client device, a web browser application or an email application.*" Ex. 1001, 21:1–3.

Petitioner relies on the same evidence and arguments for dependent claim 21 as is does for dependent claim 7. *See* Pet. 32. Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 82–86.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 21. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 21 for the reasons explained with respect to dependent claim 7.

> i)    *Dependent Claim 22*

Dependent claim 22 recites the following limitations: "*[t]he method according to claim 1, further comprising storing, operating, or using, a client operating system.*" Ex. 1001, 21:4–5.

Petitioner contends Crowds discloses dependent claim 22 because "Crowds discloses jondos "*storing, operating, or using, a client operating system,*" specifically SunOS 4.1.4. Pet. 35 (citing Ex. 1006, 82). Petitioner asserts that "Crowds further discloses that the jondo software application

IPR2022-00916
Patent 10,484,510 B2

was programmed to allow for 'portability across Unix and Microsoft platforms,'" and that a person of ordinary skill in the art "would understand Unix, Microsoft, and SunOS to refer to client operating systems." Pet. 35 (citing Ex. 1005 ¶¶ 99–101).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 22. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 22, in particular where Crowd discloses a crowd of four jondos operating on SunOS 4.1.4. *See* Ex. 1006, 82.

> j)    *Dependent Claim 23*

Dependent claim 23 recites the following limitations: "*[t]he method according to claim 1, wherein the steps are sequentially executed.*" Ex. 1001, 21:6–7.

Petitioner contends that Crowds discloses the method steps of claim 1 sequentially executed when after the random path is first established, the web request is then "forwarded along the path (*e.g.*, 5→4→6→server) such that the 'first client device' (here, jondo '6') receives the web request (and content identifier in the URL) from the 'second server' (here, jondo '4'), and sends the web request to the 'first server' or target web server." Pet. 35 (citing Ex. 1006, 73 and Fig. 2). Petitioner points out that Crowds explains that "[S]erver replies traverse the same path as the requests, only in reverse," such that "the 'first client device' receives the web content from the web server, and sends it back to the 'second server,'" thus utilizing the claimed

sequence. Pet. 35 (citing *id.* at 25–31). Petitioner arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 102–104.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 22. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 23, in particular where the method steps of claim 1 are sequentially executed by Crowds in the manner described by Petitioner.

> ### k) *Dependent Claim 24*

Dependent claim 24 recites the following limitations: "*[a] non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.*" Ex. 1001, 21:8–11.

Petitioner contends Crowds discloses dependent claim 24 because Crowds "discloses . . . a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of [claim 24]." Pet. 33 (citing Ex. 1006, 91). Mr. Teruya provides supporting testimony. *See* Ex. 1005 ¶¶ 87–88.

Crowds states that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at http://www.research.att.com/projects/crowds." Ex. 1006, Page 91. Patent Owner does not specifically address Petitioner's arguments or evidence

IPR2022-00916
Patent 10,484,510 B2

concerning dependent claim 24.  *See* PO Resp. 40–41.  Neither does Dr. Williams.  *See* Ex. 2065 ¶¶ 183–193.

Based on this record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 24.  The evidence shows that the Crowds' code has been distributed to users and the Crowds' blender is being maintained on the Internet for the operation of an active crowd.  Crowds' disclosure of the method of claim 1 is discussed in Section III.E.1, above.

> 3.       *Conclusion on Anticipation - Crowds*

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments and evidence, and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 6, 7, 15, 16, and 18–24 are anticipated by Crowds.

F.  *Obviousness Based on Crowds and RFC 2616*

Petitioner contends that claims 1, 2, 6–11, 13, 15, 16, and 18–24 would have been obvious in light of Crowds and RFC 2616.  Pet. 36–41.  Because we have already determined that independent claim 1 is anticipated by Crowds, as well as dependent claims 6, 7, 15, 16, and 18–24, we only consider whether claims 2, 8–11, and 13 would have been obvious in light of Crowds and RFC 2616 as Petitioner contends.  *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1373 (Fed. Cir. 2019) ("[I]t is well settled that a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for anticipation is the epitome of obviousness." (citations and internal quotation marks omitted)).

IPR2022-00916
Patent 10,484,510 B2

### 1. Rationale to Combine

Petitioner asserts that "[w]orking in the field of the '510 patent assumes a basic understanding of computers and Internet communications, including the standards governing HTTP requests and the TCP/IP protocol." Pet. 36. Based in part upon the technology addressed by the '510 patent, we determined that a person of ordinary skill in this art would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems. *See* Section III.B. Such a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including HTTP and TCP/IP protocols. *Id.*

Petitioner points out that the '510 patent contemplates a web server as "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." Pet. 36 (citing Ex. 1001, 4:64–67). The '510 patent acknowledges that "[a]s is known by those having ordinary skill in the art, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol." Ex. 1001, 17:23–25. The '510 patent also cites to RFC 2616 for a definition of HTTP. *Id.* at 16:21–28.

Petitioner points out that "Crowds concerns communications using these same protocols." Pet. 36 (citing Ex. 1006, 81 (TCP), 88–89 (HTTP). Petitioner contends that "[s]ince Crowds was directed at improving the same types of communications, a [person of ordinary skill in the art] developing software for like applications would have had a powerful motivation to

IPR2022-00916
Patent 10,484,510 B2

combine its disclosure with knowledge of Internet standards governing HTTP." Pet. 36 (citing Ex. 1005 ¶¶ 105–110).

Patent Owner does not specifically address Petitioner's stated rationale for combining the teachings of Crowds and RFC 2616. *See* PO Resp. 36–41. Instead, Patent Owner argues that "Crowds does not teach that a jondo may be a server," that "Crowds does not disclose or teach putting a server in the "mix," or that "Crowds also does not disclose or teach a crowd member that does not run its own web browser." *Id.* at 36. None of these arguments, however, addresses Petitioner's stated rationale for combining the teachings of Crowds and RFC 2616 described above. Rather, Patent Owner's arguments only address a contingent alternative proffered by Petitioner with respect to claim 1 "if the Board were to construe 'second server' as requiring a specialized data-center class device," which we did not adopt. *See* Pet. 37–38.

We find that Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to combine the teachings of Crowds and RFC 2616 in the manner described by Petitioner because both Crowds and RFC 2616 are directed to improving networked communications so that a person of ordinary skill in the art developing software for similar applications would have had an incentive to combine the teachings of Crowds with the knowledge of Internet standards governing HTTP described by RFC 2616.

### 2.    *Teaching Away*

Patent Owner argues that Crowds teaches away from the claimed methods of the '510 patent because: 1) Crowds does not provide the initiator

IPR2022-00916
Patent 10,484,510 B2

with anonymity as to the target web server; 2) Crowds teaches that an increase in deniability results in an increase in latency; and 3) Crowds does not teach the initiator to purposefully select a jondo to form a pathway. PO Resp. 38–39.

For the first issue, Patent Owner argues that Crowds does provide anonymity, but anonymity is not a limitation of the claims. As to the third issue, a "purposeful" selection of a device is also not claimed. Evidence concerning whether the prior art teaches away from a given invention must relate to and be commensurate in scope with the ultimate claims at issue. *See, e.g., MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264–65 (Fed. Cir. 2013).

As to the second issue of Crowds' latency, Patent Owner does not explain, nor does Dr. Williams provide support, for why Crowds would teach away from the claimed invention, that is, "a person of ordinary skill, upon reading the reference . . . would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013). Moreover, Crowds discusses ways to mitigate latency problems in its system (Ex. 1006, 19) and in Crowds there is no criticizing, discrediting, misdirecting or otherwise discouraging of the approach taken in the claims. *See Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017); *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Accordingly, we do not find that Crowds teaches away from the claimed invention of the '510 patent as Patent Owner contends.

IPR2022-00916
Patent 10,484,510 B2

### 3.    *Objective Indicia of Nonobviousness*

Patent Owner asserts that non-obviousness is supported by objective indicia, including commercial success, long-felt need, copying, and industry praise.  PO Resp. 55–73; PO Sur-reply 27–29. Petitioner disagrees, contending that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which do not have a nexus to the claims, and that Patent Owner's arguments regarding commercial success, long-felt need, copying, and industry praise suffer from additional infirmities.  Pet. Reply 24–26.

### a)    *Legal Standards*

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).  "[O]bjective indicia 'may often be the most probative and cogent evidence of nonobviousness in the record,'" and "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378.  Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC,*

63

IPR2022-00916
Patent 10,484,510 B2

856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)).  For objective indicia of nonobviousness to be accorded substantial weight, their proponent must establish a nexus between the evidence and the merits of the claimed invention.  *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)).  In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)).

On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.*  Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

IPR2022-00916
Patent 10,484,510 B2

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

### b)    Commercial Success

Patent Owner argues that nonobviousness is supported by the fact that it "provides a residential proxy service that practices the methods claimed in the '510 patent" that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or desktop having a residential IP address, as a proxy client device. PO Resp. 55 (citing Ex. 2065 ¶ 267). According to Patent Owner, it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service." PO Resp 55 (citing Ex. 2065 ¶ 268; Ex. 2038). Patent Owner asserts that its "residential proxy service has grown to dominate the market." PO Resp. 69. According to Patent Owner, in 2021 Bright Data's "residential proxy service generated revenues of $53.7 million." *Id.* Patent Owner further contends that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is evidence of commercial success. *Id.* at 68 (citing Ex. 2065 ¶ 274).

Patent Owner asserts that "the commercial success of Bright Data's residential proxy service is driven by the claimed methods' novel use of a proxy client device." PO Resp. 69 (citing Ex. 2065 ¶ 276). Patent Owner

provides claim charts purporting to show how "this commercial embodiment practices at least claims 1–2, 6–9, 15–16, 18–20, and 22–24 of the '510 Patent." PO Resp. 57–66. Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '510 [p]atent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122." *Id.* at 67 (citing Ex. 2065 ¶ 271). According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims'" and "embodies the claimed features of the '510 Patent and is coextensive with them." PO Resp. 67.

Additionally, Patent Owner argues that "[t]he features driving the commercial success of [its] residential proxy service are (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses." *Id.* Finally, Patent Owner argues that "the district court found that sufficient nexus was established." PO Sur-reply 27, n.11.

Petitioner points out that Patent Owner "asserts that two things 'driv[e]' the commercial success of its 'residential proxy service': use of 'residential IP addresses' and 'scalability' from the 'large number' of clients with 'residential IP addresses.'" Pet Reply 24 (citing PO Resp. 67–68). Petitioner argues that Patent Owner "therefore admits a lack of nexus, because neither the use of 'residential IP addresses' or 'scalability' from a

IPR2022-00916
Patent 10,484,510 B2

'large number' of clients with residential IP addresses are claimed." Pet. Reply 24.

Petitioner alleges that Dr. Williams "admits that use of 'residential' IP addresses is not claimed." *Id.* at 25 (citing Ex. 1111, 56:4–6, 56:19–57:6). Petitioner argues that Dr. Williams "cites to 2021 sales figures as showing 'commercial success,' but provides no analysis tying those sales figures to any allegedly embodying PO product." Pet. Reply 25 (citing Ex. 2065 ¶ 275). Petitioner argues that Dr. Williams "did nothing to determine commercial 'success,' other than observing 'revenues in the millions of dollars per month.'" Pet. Reply 25 (citing Ex. 1111, 168:23–169:3). Petitioner points out that Dr. Williams "did not have 'the data' to know what feature(s) drove revenue." Pet. Reply 25–26 (citing Ex. 1111, 176:7–177:21).

Based on this record, we find that Patent Owner has failed to establish a nexus between the challenged claims and the products that Patent Owner relies on to show commercial success. First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products that it relies on for commercial success embody and are coextensive with the challenged claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner relies on features of its products that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products.

For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing]

IPR2022-00916
Patent 10,484,510 B2

residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses." PO Resp. 67; *see id.* at 55 (pointing to Patent Owner's "residential proxy service [that] provides various users' client devices, such as a laptop, desktop, tablet, or smartphone, as a proxy to other user's requesting client devices"), 69 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" wherein its "residential proxy service generated revenues of $53.7 million in the year 2021").

The challenged claims, however, do not recite any limitations requiring residential proxies, residential computers, or residential IP addresses. Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer computer" or "consumer communication device." *See* Section III.C.1. At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to establish a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential

68

proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims. *See* PO Resp. 55–57, 67–69. Therefore, Patent Owner has failed to demonstrate that commercial success of its products is the "direct result" of the claimed invention's unique characteristics.

We also are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established." PO Sur-reply 27, n.10 (citing Ex. 2014, 4). Patent Owner relies on the district court's ruling on defendants' motion to strike the opinions of Patent Owner's expert Dr. Rhyne, where the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of nonobviousness" because it "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention." Ex. 2014, 4. The district court's order, however, does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing such an explanation. It is also not clear from the record whether the district court's finding was that nexus had been established, or simply that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony to establish nexus at trial.

*c)    Long-Felt Need*

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 70. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target web site," but "that website could still likely identify data center server IP addresses as proxy addresses" because they

IPR2022-00916
Patent 10,484,510 B2

"were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic location." *Id.* (citing Ex. 2065 ¶ 277). "In contrast," Patent Owner asserts, its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." PO Resp 70. Patent Owner further contends that its proxy client devices "can dramatically increase the scale of IP addresses that can be included in a proxy network." *Id.*

For similar reasons as for commercial success, Patent Owner has not established that there is a nexus between Patent Owner's evidence of long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a "long-felt need" are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 67. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

### d)    Copying

Patent Owner argues that "[d]uring the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service, then under the name as 'Hola,' was presented." PO Resp. 71 (citing Ex. 2065 ¶ 278). Specifically, Patent Owner argues that its representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas Okmanas) to incorporate its software development kit (SDK) in Oxylabs' applications, but that instead Oxylabs "subsequently released their own SDK for Oxylabs'

own residential proxy network." PO Resp. 71 (citing Ex. 2049, 202:12–204:8; Ex. 2047, 131:23–132:7; 152:8–153:6; Ex. 2065 ¶ 278). Patent Owner also asserts that Mr. Okmanas testified that he was looking for "a system that works like hola.org," that Oxylabs "wanted to develop its own residential proxy service," and that "he believed that he needed to do what Bright Data (previously known as Luminati and Hola) were doing to be successful." PO Resp. 71–72 (citing Ex. 2047, 95:20–97:1, 103:18–104:10, 149:13–150:8; Ex. 2065 ¶ 279). "This testimony," according to Patent Owner, "is strong evidence of copying." PO Resp. 72 (citing Ex. 2065 ¶ 279).

For similar reasons as for commercial success and long-felt need, no nexus has been shown between Patent Owner's evidence of copying and the challenged claims. Although Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied, it refers generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 71–72. As explained above, however, the challenged claims do not recite or require a residential proxy service. Therefore, Patent Owner has failed to make the requisite showing that the claimed invention was copied.

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '510 [p]atent as described above." PO Resp. 72–73 (citing Ex. 2065 ¶ 281). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." PO Resp. 73.

IPR2022-00916
Patent 10,484,510 B2

For similar reasons as for the other objective indicia, no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. *Id.* Therefore, Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

e)     *Conclusion*

For the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise is entitled to little weight in our obviousness analysis because Patent Owner has not shown a sufficient nexus to the evidence presented and the claimed invention.

4.     *Dependent Claim 2*

Dependent claim 2 recites the following limitations:

> [t]he method according to claim 1, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first client device, during, as part of, or in response to, a start-up or power-up of the first client device, a first message to the second server, and wherein the first messages comprises the first client IP address, the MAC address, or the hostname.

Ex. 1001, 19:32–39.

According to Petitioner, Crowds discloses that jondos have host names: "[t]he user selects this jondo as her web proxy by specifying its host name and port number in her web browser as the proxy for all services." Pet. 38 (citing Ex. 1006, 73; *see also id.* at Fig. 6 (identifying host names of multiple available jondos). Petitioner asserts that "Crowds also discloses a

IPR2022-00916
Patent 10,484,510 B2

setup phase for new jondos, such that other jondos learn information including their IP address shared password, and use this information when selecting a jondo as a proxy." Pet. 39. "In the setup phase," Petitioner explains, "the Blender gets the IP address of the joining jondo." *Id.* (citing Ex. 1006, 87). According to Petitioner, "[t]he blender then informs the other jondos of the new member and shared key, so that 'all members are equipped with the data they need for the new member to participate in the crowd.'" Pet. 39 (quoting Ex. 1006, 87).

According to Petitioner, it would be obvious to a person of ordinary skill in the art "that the other jondo (*e.g.*, the one participating as the second server) would receive a message from the first jondo (first client device), during the first jondo's initialization period, which includes the first jondo's IP address." Pet. 39 (Ex. 1005 ¶¶ 118–122).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. *See* PO Resp. 36–38, 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 2, wherein during the setup phase a new user selects a jondo as a web proxy by specifying a host name as the proxy for all services such that other jondos learn this information including the IP address shared password, and use this information when selecting a jondo as a proxy.

IPR2022-00916
Patent 10,484,510 B2

### 5. *Dependent Claim 8*

Dependent claim 8 recites the following limitations: "*[t]he method according to claim 1, further comprising periodically communicating over the TCP connection between the second server and the first client device.*" Ex. 1001, 20:4–6.

According to Petitioner, "Crowds discloses establishing a static path over a series of jondos, consisting of TCP connections, and that HTTP requests are passed over these connections." Pet. 39 (citing Ex. 1006, 80 (discussing static paths)). Petitioner asserts that "Crowds also discloses support for embedded images within webpages, which would cause HTTP clients and servers to re-use persistent connections to fetch both web objects using the same TCP/IP connection." Pet. 39 (citing Ex. 1006, 83; Ex. 1005 ¶ 124).

According to Petitioner "Crowds discloses group membership management techniques by which jondos track the liveness of other jondos in the system," such that a "jondo can also remove jondos from its list of crowd members, if it detects that those jondos have failed." Pet. 40 (citing Ex. 1006, Fig. 3, line 25). Petitioner explains that "jondos periodically communicate with one another, and thus detect when another jondo fails to respond to the periodic communication," and that a person of ordinary skill in the art "would understand that a peer-to-peer system such as Crowds would maintain group membership by periodically communicating to ensure the liveness of other jondos." Pet. 40 (citing Ex. 1005 ¶ 125).

Petitioner explains that "[u]nder RFC 2616, the then current specification for HTTP (version 1.1), the default behavior where HTTP is

IPR2022-00916
Patent 10,484,510 B2

sent over TCP was (and is) to use persistent connections, so the two HTTP end-points can send and receive more than one HTTP request and response pair." Pet. 40 (citing Ex. 1013 § 8.1). Petitioner further explains that "[p]ersistent connections were also supported in HTTP/1.0 with the use of explicit Keep-Alive HTTP headers and also documented in HTTP/1.1" where "[e]xchanging keep alive messages was a standard feature of devices communicating via persistent HTTP connections." Pet. 40 (citing Ex. 1013 §§ 8.1.3, 13.5.1, 19.6; Ex. 1023 § 19.7.1).

Petitioner argues that it "would have been obvious to have used an implementation in accordance with RFC 2616, which would have entailed both periodic communication between the jondos, and doing so by exchanging "keep-alive" messages." Pet. 41 "Doing so," argues Petitioner, "would have been obvious because it was an existing, known implementation that could easily have been employed to implement the disclosed feature of detecting breaks in the TCP connection, with predictable results." *Id.* (citing Ex. 1005 ¶ 130).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. See PO Resp. 36–38, 40–41. Neither does Dr. Williams. See Ex. 2065 ¶¶ 183–193.

We find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616, such as through the use of periodic "keep-alive" messages or other periodic communications over persistent HTTP/TCP connections between jondos acting as a second server and first client device meet the recited limitations of dependent claim 8.

75

IPR2022-00916
Patent 10,484,510 B2

### 6. *Dependent Claim 9*

Dependent claim 9 recites the following limitations: "*[t]he method according to claim 8, wherein the periodically communicating comprises exchanging 'keep alive' messages.*" Ex. 1001, 20:7–9.

Petitioner relies on the same arguments and evidence for dependent claim 9 as it does for dependent claim 8.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. *See* PO Resp. 36–38, 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 9 for the reasons explained with respect to dependent claim 8.

### 7. *Dependent Claim 10*

Dependent claim 10 recites the following limitations: "*[t]he method according to claim 1, further comprising determining, by the first client device, that the received first content, is valid.*" Ex. 1001, 20:10–12.

Petitioner asserts that RFC 2616 discloses headers that implement the subject matter of claim 10. Pet. 41 (citing Ex. 1013 at § 14.9). Petitioner argues that "the techniques for this taught by RFC 2616 are identical to the 'Cache-Control' directives utilized in the ['510] Patent to implement this functionality." Pet. 40. The cache-control directives described in RFC 2616 include, for example, "[c]ontrols over cache revalidation and reload." *See* Ex. 1013 § 14.9.

IPR2022-00916
Patent 10,484,510 B2

Figure 12 of the '510 patent provides a flow chart illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid. The '510 patent acknowledges that "the HTTP protocol, *defined by RFC 2616*, outlines specific methods . . . within the HTTP headers signifying the validity of certain data, such as, but not limited to, by using HTTP header information." Ex. 1001, 16:21–25 (emphasis added).

Petitioner argues that it "would have been obvious for [a person of ordinary skill in the art] faced with a like issue of data validation for retrieved web content to take advantage of this widely adopted standard to accomplish that end, as set forth in RFC 2616." *Id.* (citing Ex. 1005 ¶¶ 132–134).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. See PO Resp. 36–38, 40–41. Neither does Dr. Williams. See Ex. 2065 ¶¶ 183–193.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 10.

### 8.    *Dependent Claim 11*

Dependent claim 11 recites the following limitations: "*[t]he method according to claim 10, wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616.*" Ex. 1001, 20:13–15.

77

IPR2022-00916
Patent 10,484,510 B2

Petitioner uses the same arguments and evidence for dependent claim 11 that it used for dependent claim 10.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. *See* PO Resp. 36–38, 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 11 for the reasons discussed with respect to dependent claim 10.

9.    *Dependent Claim 13*

Dependent claim 13 recites the following limitations:

*The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by:*

*downloading, by the first client device from the Internet, the software application; and*

*installing, by the first client device, the downloaded software application.*

Petitioner contends that Crowds discloses dependent claim 13 because Crowds "discloses (and states how a user could download from the Internet for installation) a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of [claim 13]."  Pet. 33

IPR2022-00916
Patent 10,484,510 B2

(citing Ex. 1006, 91). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 87–88.

Patent Owner argues that "Petitioner fails to show that Crowds discloses or teaches 'storing of the first content' and 'sending . . . the stored first content' as recited in claim 13." PO Resp. 40. Patent Owner also argues that "Petitioner does not show that the software package causes the processor on the jondo to store the first content or send the stored first content as recited in claim 13." *Id.* (citing Ex. 2065 ¶ 185). Patent Owner's arguments are supported by Dr. Williams' testimony. *See* Ex. 2065 ¶¶ 184–186.

> In its Reply, Petitioner points out that
>
> [c]laim 13, challenged by PO as to Crowds and MorphMix, adds two method steps regarding the downloading and installing of a software application. PO does not dispute that the prior art discloses those steps, but instead refers to the language "the receiving and storing of the first content" and "sending … stored first content" used in claim 13 to refer back to claim 1 (even though "the storing" has no antecedent basis). POR, 40, 52. PO's argument fails because claim 13 does not specify any particular means of storage of the HTTP content, and therefore the use of typical computer memory satisfies this step. Williams admits that typical "user computers" are disclosed in Crowds (EX-2065, ¶ 164).

Pet. Reply 23.

In its Sur-reply, Patent Owner does not address the issues raised by Petitioner in its Reply, but instead "focuses on independent claim 1 and defers to its analysis of the dependent claims as set forth in the [Patent Owner Response]," which related to the storage limitations. PO Sur-reply 22, n.9 (citing PO Resp. 40–41; 46–47; 52–53). However, as Petitioner

IPR2022-00916
Patent 10,484,510 B2

contends, and we agree, Crowds discloses typical user computers with memory that satisfies the storing step. Pet. Reply 23 (citing Ex. 2065 ¶ 164). Dr. Williams also acknowledges that the jondos of Crowds are "user computers". Ex. 2065 ¶ 164. A person of ordinary skill in the art at the time of the invention would understand that a "user computer" such as those described in Crowds would typically have computer memory and storage capabilities in order to function in the manner that Crowds operates. *See* Section III.B, above.

For downloading of the software application, Crowds expressly discloses that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at http://www.research.att.com/projects/crowds" (Ex. 1006, 91), and Patent Owner has presented no argument to rebut this evidence.

Based upon the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 13.

>  10.  *Conclusion on Obviousness - Crowds and RFC 2616*

Based upon consideration of the entire record, including Petitioner's arguments and evidence and Patent Owner's arguments and evidence of secondary considerations, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2, 8–11, and 13 would have been obvious over the combined teachings of Crowds and RFC 2616 and

IPR2022-00916
Patent 10,484,510 B2

that a person of ordinary skill in the art would have combined the teachings of Crowds and RFC 2616 in the manner described by Petitioner. As noted above, we give little weight to Patent Owner's evidence of secondary considerations in our obviousness analysis because Patent Owner has failed to establish a sufficient nexus between that evidence and the challenged claims.

## G. Anticipation Based on Border

Petitioner asserts that claims 1, 6, 10, 15–20, 23, and 24 are anticipated by Border. Pet. 42–55. Because we have already determined that claims 1, 6, 10, 15, 16, 18–20, 23, and 24 are unpatentable, we only consider whether claim 17 is anticipated by Border as Petitioner contends. However, in order to anticipate dependent claim 17, Border must first disclose the limitations of independent claim 1, which are incorporated into claim 17. For ease of reference, Figure 1 from Border is set out below.

*FIG. 1*



IPR2022-00916
Patent 10,484,510 B2

Figure 1 from Border, above, is a diagram depicting a communication system employing a downstream proxy server and an upstream proxy server for accessing a web server.

1.    *Independent Claim 1*

The preamble of claim 1 reads as follows:

*A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:*

Ex. 1001, 19:18–21.

Petitioner asserts that the preamble of claim 1 is disclosed by Border. Pet. 45. Petitioner identifies the first client device recited in the preamble as upstream server 107 in Border. *Id.* Petitioner identifies the recited second server as downstream server 105. *Id.* Petitioner identifies the recited first server as web server 109. *Id.* Petitioner identifies the recited first content identifier as the requested URL. *Id.* And Petitioner identifies the recited first content as the requested web page at the requested URL. *Id.* (citing Ex. 1005 ¶¶ 137–145).

The remaining steps of claim 1 are as follows:

*[a] establishing a Transmission Control Protocol (TCP) connection with a second server;*

*[b] sending, to the web server over an Internet, the first content identifier;*

*[c] receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and*

IPR2022-00916
Patent 10,484,510 B2

> [d] *sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.*

Ex. 1001, 19:22–31.

Petitioner's analysis continues by showing that each step of claim 1 is disclosed in Border. Pet. 42–50.

Petitioner asserts that step 1[a] is met because "Figure 1 of Border shows a persistent TCP ('P-TCP') connection between upstream server (107) (first client device) and downstream server 105 (second server)." Pet. 45–46 (citing Ex. 1012, 7:51–58; Ex. 1005 ¶ 146). Petitioner explains that

> downstream server 105 (expressly called a "server" in Border) is the "second server," as it accepts a connection from web browser 103 and sends back a response to web browser 103's GET request. Down-stream server 105 retrieves the requested first content by communicating with web server 109 (the "first server") through upstream server 107 ("first client device").

Pet. 46.

With respect to the second step 1[b], Petitioner asserts that this step is met when "[u]pstream server 107 (the first client device) issues a GET request to Web server 109," where the "request (GET) is for a URL." Pet. 47 (citing Ex. 1012, 5:18–24, 32–35, Fig. 2; Ex. 1005 ¶¶ 152–156) (footnote omitted).

As for the third step 1[c], Petitioner asserts that this step is met when "[i]n response to upstream server 107 'issu[ing] the GET URL HTML request the web server 109 for the HTML page . . . the web server 109 transmits the requested HTML page to the upstream server.'" Pet. 48 (citing Ex. 1012, 5:34–37, Fig. 2).

IPR2022-00916
Patent 10,484,510 B2

For the fourth step 1[d], Petitioner asserts this step is met when "[a]fter receiving the web page from web server 109, upstream server 107 'forwards the HTML page to the downstream server 105,'" and "[d]ownstream server 105 then forwards the first content to web browser 103, in response to web browser 103's original GET request, in accordance with the second server's role as a 'server.'"  Pet. 49–50 (citing Ex. 1012, 5:38–41; Ex. 1005 ¶¶ 160–162).

Petitioner explains that these communication steps are depicted in Border's Figure 2, shown below.



IPR2022-00916
Patent 10,484,510 B2

Border's Figure 2, above, is a sequence diagram showing the communications between the web server, upstream and downstream servers, and browser of Border.

For the preamble, Patent Owner relies on the same arguments it made with respect to Crowds. PO Resp. 41 ("For the same reasons discussed above regarding Crowds, Border does not disclose a 'first client device' as recited in the preamble of claim 1") (citing Ex. 2065 ¶ 201). Patent Owner's arguments concerning the preamble are unavailing for the same reasons we discussed with respect to Crowds. *See* Section III.E.1, above.

For claim 1 steps 1[a]–1[c], Patent Owner does not provide any specific arguments. *See* PO Resp. 41–43.

For step 1[d], Patent Owner argues that

[f]or the same reasons discussed above regarding Crowds, during performance of this method step, under the purely role-based constructions, upstream server 107 is operating in the role of a server, not a client, and therefore, upstream server 107 cannot be a client device. EX.2065 at ¶204. Also, under the purely role-based constructions, downstream server 105 is operating in the role of a client, not a server, and therefore downstream server 105 cannot be a server. EX.2065 at ¶205. For at least these reasons, Border does not disclose claim 1 under the purely role-based constructions. EX.2065 at ¶206.

PO Resp. 42.

Patent Owner's arguments with respect to claim 1 step [d] are unavailing for the same reasons discussed above with respect to Crowds. *See* Section III.E.1.d, above. Patent Owner's arguments are unavailing because they rigidly focus on an alleged requirement that devices cannot operate in different roles, an argument that was rejected by the district court

IPR2022-00916
Patent 10,484,510 B2

in its claim construction. Rather, the district court explained, and we agree, that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." Ex. 1020, 10 (internal quotation marks omitted).

Patent Owner's other arguments with respect to Border, for example that "Border does not disclose the architecture of claim 1 under Patent Owner's proposed constructions" (PO Resp. 42–43) are unavailing because they argue proposed claim constructions that we did not adopt. *See* Section III.C, above.

We have considered Petitioner's evidence and arguments that each step of claim 1 is disclosed by Border, as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Border discloses all the limitations of independent claim 1.

> 2.  *Dependent Claim 17*

Dependent claim 17 recites the following limitations: "*[t]he method according to claim 1, further comprising storing, by the first client device in response to the receiving from the web server, the first content.*" Ex. 1001, 20:49–51.

For claim 17, Petitioner argues that "[i]n response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117." Pet. 53 (citing Ex. 1012, 5:36–38; Ex. 1005 ¶¶ 179–180).

IPR2022-00916
Patent 10,484,510 B2

Patent Owner argues that "[b]ecause Border does not disclose or teach independent claim 1, Border does not disclose or teach dependent [claim 17]." PO Resp. 46 (citing Dec. 8; Ex. 2065 ¶ 216). Because we have already determined that Border discloses all the limitations of independent claim 1, Patent Owner's argument is unavailing. *See* Section III.G.1, above.

We have considered Petitioner's evidence and arguments as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Border discloses all the limitations of dependent claim 17.

*H.  Obviousness Based on Border and RFC 2616*

Petitioner contends that claims 1, 6, 8–11, 13, 15–20, and 22–24 would have been obvious in light of Border and RFC 2616. Pet. 53–57. Because we have determined that these claims are unpatentable on other grounds, we do not reach Petitioner's arguments on this ground.

*I.  Anticipation Based on MorphMix*

Petitioner asserts that claims 1, 6–8, 13, 15, 16, and 18–24 are anticipated by MorphMix. Pet. 60–73. Because we have determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

*J.  Obviousness Based on MorphMix and RFC 2616*

Petitioner contends that claims 1, 2, 6–11, 13, 15, 16, and 18–24 would have been obvious over MorphMix in light of RFC 2616. Pet. 73–78. Because we have determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

IPR2022-00916
Patent 10,484,510 B2

IV. MOTION TO SEAL AND PROTECTIVE ORDER[9]

Patent Owner has filed a Motion to Seal and to Enter the Joint
Protective Order (Paper 32, "Motion"), which seeks to seal Exhibits 2039,
2041–2044, and 2065 and associated portions of the Patent Owner
Response, and to enter an agreed-upon Joint Protective Order (Ex. 2071).
Paper 32, 1.   Patent Owner asserts that Exhibit 2039 contains sensitive
technical network information, Exhibits 2041–2044 contain source code and
related files, Exhibit 2065 is an expert declaration that references some of
the sensitive information in the exhibits, and portions of the Patent Owner
Response incorporate some of the sensitive information. *Id.* at 2–6.  Patent
Owner argues that it would be harmed by the public disclosure of its highly
sensitive information, that it has taken steps to guard against disclosure,
which outweighs the public's interests. *Id.*  This Motion is unopposed.

We have reviewed the exhibits at issue, including the portions of the
exhibits and Patent Owner Response, and the explanations of the
confidential nature of the materials for which sealing is sought, as discussed
in the Motion.  We grant the Motion to Seal (Paper 32) and the associated
request to enter the Protective Order (Ex. 2071).

V.  CONCLUSION

For the foregoing reasons, we determine that Petitioner has
demonstrated by a preponderance of the evidence that claims 1, 2, 6–11, 13,

---

[9]Petitioner has filed a Motion to Exclude Evidence (Paper 43), which was
withdrawn at the Oral Hearing without objection by Patent Owner. *See*
Paper 48, 5.

IPR2022-00916
Patent 10,484,510 B2

and 15–24 of U.S. Patent No. 10,484,510 B2 are unpatentable on the bases
set forth in the following table.[10]

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
Final Decision, we draw Patent Owner's attention to the April 2019 *Notice
Regarding Options for Amendments by Patent Owner Through Reissue or
Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg.
16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2022-00916
Patent 10,484,510 B2

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 6, 7, 13, 15, 16, 18–24 | 102 | Crowds | 1, 6, 7, 15, 16, 18–24 | |
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103 | Crowds, Knowledge of POSITA, RFC 2616 | 2, 8–11, 13 | |
| 1, 6, 10, 15–20, 23, 24 | 102 | Border | 17 | |
| 1, 6, 8–11, 13, 15–20, 22–24 | 103 | Border, Knowledge of POSITA, RFC 2616[11] | | |
| 1, 6–8, 13, 15, 16, 18–24 | 102 | MorphMix | | |
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103 | MorphMix, Knowledge of POSITA, RFC 2616 | | |
| **Overall Outcome** | | | 1, 2, 6–11, 13, 15–24 | |

---

[11] Because each of these challenged claims is held unpatentable on other grounds, we do not reach grounds 4–6 in the Petition.

IPR2022-00916
Patent 10,484,510 B2

## VI. ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6–11, 13, and 15–24 of U.S. Patent No. 10,484,510 B2 are unpatentable;

FURTHER ORDERED that the Motion to Seal (Patent Owner's Response (Paper 30), Exs. 2039, 2041–2044, and 2065) is *granted*;

FURTHER ORDERED that the request to enter the Protective Order (Ex. 2071) is *granted*;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-00916
Patent 10,484,510 B2

PETITIONER:

Liang Huang
Wensheng Ma
MAURIEL KAPOUYTIAN WOODS LLP
rhuang@mkwllp.com
wma@mkwllp.com


PATENT OWNER:

Thomas Dunham
Elizabeth O'Brien
CHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com